**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BILL BADI GAMMOH, dba Taboo
Theater aka Pelican Theater;
LESLIE WEST; ARMINE MICHELLE
BEDROSIAN; CHRISTINE JOHANNA
FENER; CHARBONESSE GARRETT;
HEATHER ELOISE ELAM; STACY JOY
ANDRE; MEGHANN LARA ANN
ONSELEN,

        *Plaintiffs-Appellants,*

       v.

CITY OF LA HABRA,

        *Defendant-Appellee.*

No. 04-56072

D.C. No.
CV-03-00911-GLT

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Gary L. Taylor, District Judge, Presiding

Argued and Submitted
November 1, 2004—Pasadena, California

Filed January 26, 2005
Amended April 1, 2005

Before: A. Wallace Tashima, Raymond C. Fisher, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

## **COUNSEL**

Scott W. Wellman and Stuart Miller, Wellman & Warren, Laguna Hills, California, for the plaintiffs-appellants.

Deborah J. Fox and Dawn A. McIntosh, Fox & Sohagi, Los Angeles, California, for the defendant-appellee.

Scott D. Bergthold, Chattanooga, Tennessee, for *Amicus Curiae* League of California Cities.

---

## ORDER

The court's opinion, filed January 26, 2005, is amended as follows:

The second paragraph on slip op. 1131, under heading "C", line 3: the words "leaves open" are deleted and replaced with, "does not unreasonably limit".

Slip op. 1135, first paragraph, line 2: the word "ample" shall be inserted between "open" and "alternative".

With these amendments, Judges Fisher and Tallman have voted to deny the petition for rehearing en banc and Judge Tashima so recommends. The full court has been advised of the petition for rehearing en banc. No judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for rehearing en banc is DENIED. No further petitions for rehearing or petition for rehearing en banc shall be entertained.

---

## OPINION

TALLMAN, Circuit Judge:

This case involves constitutional challenges to a city ordinance requiring "adult cabaret dancers" to remain two feet

away from patrons during performances. The district court rejected these challenges by dismissing some of the Appellants' claims on the pleadings and granting summary judgment as to other claims. We denied emergency motions for a stay of enforcement of the Ordinance pending appeal and now affirm.

I

The City of La Habra's (City's) Municipal Ordinance 1626 ("Ordinance") regulates adult businesses. The first section of the Ordinance contains extensive findings that adult businesses generate crime, economic harm, and the spread of sexually transmitted diseases. These findings are based on studies and police declarations from other jurisdictions, federal and state judicial opinions, and public health data from surrounding southern California counties. Ordinance, § 1. Other sections of the Ordinance contain regulations purporting to address the secondary effects described in the first section, including a prohibition of physical contact between patrons and performers (the "no-touch rule") and a requirement that adult cabaret dancers perform at least two feet away from their patrons (the "two-foot rule"). Ordinance, §§ 4, 7.

The Appellants are Bill Badi Gammoh, the owner of an adult establishment in the City, several dancers at Gammoh's club, and a dancer who has been offered employment at Gammoh's club but has not yet accepted it. Gammoh's establishment, which does not serve alcoholic beverages, features entertainment by dancers who perform nude on stage and then dress in minimal clothing before offering one-on-one offstage dances.[1] The Appellants do not challenge the provisions of the

_____

[1] Early in this litigation before the district court the Appellants used the term "lap dance" to refer to these performances. They later distanced themselves from this term, preferring "clothed proximate dancing" instead. We reference these individual, close-up performances using the term "offstage dancing" because the City regulates nude on-stage performances separately from partially-clothed offstage performances and it is the latter set of regulations that are challenged here.

Ordinance governing on-stage dancing and other aspects of the operation of an adult cabaret; they challenge only the two-foot rule.

Three weeks after the City Council passed the Ordinance, the Appellants filed their constitutional challenge in the Superior Court of California for Orange County. The case was subsequently removed to the United States District Court for the Central District of California. The Appellants were unsuccessful before the district court. In addition to other rulings that the Appellants do not challenge on appeal, the district court dismissed the Appellants' overbreadth argument and part of their vagueness challenge with prejudice, and entered summary judgment in favor of the City on their regulatory takings claim, a First Amendment challenge, and the remaining vagueness argument. The Appellants pursue their vagueness, overbreadth, takings, and free speech and expression claims on appeal.

## II

The Ordinance's two-foot rule applies exclusively to "adult cabaret dancers." The Ordinance defines an "adult cabaret dancer" as:

> any person who is an employee or independent contractor of an "adult cabaret" or "adult business" and who, with or without any compensation or other form of consideration, performs as a sexually-oriented dancer, exotic dancer, stripper, go-go dancer or similar dancer whose performance on a regular and substantial basis focuses on or emphasizes the adult cabaret dancer's breasts, genitals, and or buttocks, but does not involve exposure of "specified anatomical areas" or depicting or engaging in "specified sexual activities." Adult cabaret dancer does not include a patron.

Ordinance, § 4. The district court rejected the Appellants' assertion that this definition is vague and overbroad because it contains subjective terms. We review the district court's ruling *de novo*. *See United States v. Rodriguez*, 360 F.3d 949, 953 (9th Cir. 2004); *United States v. Linick*, 195 F.3d 538, 541 (9th Cir. 1999).

A

**[1]** To survive a vagueness challenge, a regulation must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also United States v. Adams*, 343 F.3d 1024, 1035 (9th Cir. 2003), *cert. denied*, 123 S. Ct. 2871 (2004). A greater degree of specificity and clarity is required when First Amendment rights are at stake. *Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1057 (9th Cir. 1986).

The Appellants argue that the subjective language used to define an "adult cabaret dancer" makes the definition, and thus the Ordinance, unconstitutionally vague. *Cf. City of Chicago v. Morales*, 527 U.S. 41, 56-64 (1999) (holding a provision criminalizing loitering, which is defined as "to remain in any one place with no apparent purpose," void for vagueness because the provision was "inherently subjective because its application depends on whether some purpose is 'apparent' to the officer on the scene"); *Tucson Women's Clinic v. Eden*, 379 F.3d 531, 554-55 (9th Cir. 2004) (holding a statute requiring physicians to treat patients "with consideration, respect, and full recognition of the patient's dignity and individuality" void for vagueness because it "subjected physicians to sanctions based not on their own objective behavior, but on the subjective viewpoint of others") (internal quotation and citation omitted); *Free Speech Coalition v. Reno*, 198 F.3d 1083, 1095 (9th Cir. 1999), *aff'd sub nom. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (holding a provision

that criminalized sexually explicit images that "appear[ ] to be a minor" or "convey the impression" that a minor is depicted unconstitutionally vague because it was unclear "whose perspective defines the appearance of a minor, or whose impression that a minor is involved leads to criminal prosecution").

Several of the terms within the Ordinance's definition of "adult cabaret dancer" — "sexually oriented dancer," "exotic dancer," "similar dancer," "regular basis," and "focuses on or emphasizes" — are unarguably subjective. However, two main factors distinguish the Ordinance from cases such as *Morales*, *Tucson Women's Clinic*, and *Free Speech Coalition*, where the regulations were held to be too subjective to give notice to ordinary people or guidance to law enforcement: 1) the subjective terms in the Ordinance are used in combination with other terms, and 2) the subjective terms do not define prohibited conduct.

[2] This circuit has previously recognized that otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity. *See Kev*, 793 F.2d at 1057 (holding that an ordinance prohibiting dancers from "caressing" and "fondling" patrons was not vague "in the context of the other definitions provided in the ordinance" at issue). In this case, the district court recognized that the two-foot rule applies only to "adult cabaret dancers" who meet the following five qualifications: 1) the individual must perform at an "adult cabaret";[2] 2) the performer must

---

[2]The City of La Habra Code defines "adult cabaret" as:

> a nightclub, bar or other establishment (whether or not serving alcoholic beverages) which features live performances by topless and/or bottomless dancers, go-go dancers, exotic dancers, strippers, or similar entertainers, and where such performances are distinguished or characterized by their emphasis on matter depicting, describing or relating to "specified sexual activities" or "specified anatomical areas."

City of La Habra Code §18.60.010.

perform as a sexually-oriented dancer, exotic dancer, stripper, or similar dancer; 3) the performance must focus on or emphasize the performer's breasts, genitals, and/or buttocks; 4) the performance must have this focus or emphasis on a regular basis; and 5) the performance must have this focus or emphasis on a substantial basis. Thus, an "adult cabaret dancer" is defined by a combination of features, not by any one subjective term. The combined terms outline the performer, the place of the performance, and the type of performance. Each of the five limitations provides context in which the other limitations may be clearly understood. The definition as a whole gives notice to performers and ample guidance to law enforcement officers as to who is and who is not an "adult cabaret dancer."

Furthermore, although the definition of an "adult cabaret dancer" contains subjective terms, the prohibited conduct is defined objectively. It is not illegal to be an adult cabaret dancer; only to be an adult cabaret dancer performing within two feet of a patron. This distinction introduces additional objectivity into the Ordinance because the act that is prohibited — being within two feet of a patron — is certainly not vague.[3]

[3] Vagueness doctrine cannot be understood in a manner that prohibits governments from addressing problems that are difficult to define in objective terms. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("we can never expect mathematical certainty from our language"). In this case, a combination of subjective and objective terms is used to give a clear picture of an "adult cabaret dancer" and the conduct

---

[3]The appellant dancers argue that they will not relinquish their proximity to patrons, and thus need to know how not to be "adult cabaret dancers." In other words, they assert that they need to know how to continue their sexually expressive performances within two feet of their patrons. This, however, is exactly what the Ordinance prohibits. The fact that the regulation will necessarily alter the dancers' conduct does not make it vague.

prohibited of such a dancer is defined objectively. Thus, the definition of "adult cabaret dancer" is sufficiently clear to give notice to performers and guidance to law enforcement. *See Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001) ("perfect clarity is not required even when a law regulates protected speech").

B

**[4]** The Appellants claim that the definition of "adult cabaret dancer" is overbroad because it could apply to mainstream or avant-garde performances as well as adult entertainment. The Supreme Court and this circuit have emphasized that "where a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *World Wide Video of Washington, Inc. v. City of Spokane*, 368 F.3d 1186, 1198 (9th Cir. 2004) (quoting *Osborne v. Ohio*, 495 U.S. 103, 112 (1990) (internal quotations omitted)). In this case, potentially overbroad applications of the Ordinance are minimal because performances occurring outside of an adult cabaret are unaffected by the Ordinance, and those occurring in an adult cabaret and containing the sexual emphasis that defines an "adult cabaret dancer" are within the Ordinance's legitimate sweep.

The Appellants were unable to cite any example of a performance that would fall within the Ordinance to which application of the Ordinance's restrictions would be overbroad. The examples proffered — including a duet, a tango, and an Elvis impersonator — are unpersuasive. A *pas de deux*, a ballroom dance, and an impersonation of the King each escapes the two-foot limitation unless performed in an establishment which features live performances by "topless and/or bottomless dancers, go-go dancers, exotic dancers, strippers or similar entertainers" characterized by an emphasis on " 'specified sexual activities' or 'specified anatomical areas.' " *See supra*

note 2 (quoting City of La Habra Code § 18.60.010(C)). However, if they occur within an adult cabaret and the performer meets all five prongs of the definition of "adult cabaret dancer," these performances fall within the statute's legitimate sweep.

**[5]** Regardless of whether the dance is a tango or more typical adult entertainment, requiring a two-foot separation between dance partners in this highly-charged sexual atmosphere may reasonably advance the City's legitimate goal of reducing secondary effects of adult entertainment. The two-foot rule may, for example, provide a line of sight for enforcement of the "no touch" rule and prevent exchanges of money and drugs. When performed in an adult cabaret, these performances, even if done in an Elvis costume, are thus within the statute's legitimate reach.

**[6]** Even if the Appellants were able to identify performances that fulfill all aspects of an "adult cabaret dancer" but are not tied to the secondary effects the statute is designed to address, "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). Although we recognize that "the First Amendment needs breathing space," *World Wide Video*, 368 F.3d at 1198, in this situation there is no "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Taxpayers for Vincent*, 466 U.S. at 801. If an overbroad application of the Ordinance exists, it is insubstantial when "judged in relation to the statute's plainly legitimate sweep." *See Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973).

## III

The district court dismissed the Appellants' regulatory takings claim on summary judgment. We review this decision *de*

*novo. Cal. First Amend. Coalition v. Calderon*, 150 F.3d 976, 980 (9th Cir. 1998). We "must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.*

**[7]** The takings clause of the Fifth Amendment protects *private property* from being taken for public use without just compensation. U.S. CONST. amend. V (emphasis added). "In order to state a claim under the Takings Clause, a plaintiff must first demonstrate that he possesses a 'property interest' that is constitutionally protected." *Schneider v. Cal. Dep't Corr.*, 151 F.3d 1194, 1198 (9th Cir. 1998) (internal citation omitted). The Appellants have not here pointed to a "property interest" interfered with by the City of La Habra's regulation of the dancers' conduct.[4] The district court thus properly dismissed the Appellants' takings claim.

IV

The Appellants argue that the Ordinance violates the First Amendment's guarantees of freedom of speech and expression. The district court evaluated the Ordinance under intermediate scrutiny and determined that the Appellants' First Amendment rights had not been violated. We review the district court's decision to grant summary judgment *de novo*, viewing the evidence in the light most favorable to the Appellants and looking for genuine issues of material fact. *See Calderon*, 150 F.3d at 980.

---

[4]Certainly Mr. Gammoh and the dancers may suffer economic losses if patrons are unwilling to pay for dances that must be at least two feet away from customers. Their claim of right to this stream of income was essentially the basis of the vested rights argument that the Appellants made before the district court. The district court rejected this argument on summary judgment, and Appellants did not appeal that ruling.

A

First, we must determine whether the Ordinance is a complete ban on protected expression. *See Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1164 (9th Cir. 2003) (plurality opinion) (citing *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002), and *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46 (1986)). We conclude that it is not.

**[8]** The two-foot rule merely requires that dancers give their performances from a slight distance; it does not prohibit them from giving their performances altogether. The rule limits the dancers' freedom to convey their erotic message but does not prohibit them from performing erotic one-on-one dances for patrons. *See Renton*, 475 U.S. at 46. Because the dancers' performances may continue, albeit from a slight distance, this case stands in sharp contrast to our recent decision in *Dream Palace v. County of Maricopa*, where we applied strict scrutiny to an ordinance regulating adult businesses because even the county conceded that the ordinance was a complete ban on nude and semi-nude dancing. 384 F.3d 990, 1018 (9th Cir. 2004). Here, the Ordinance prescribes where offstage dancing can occur (at least two feet away from patrons) but it does not ban any form of dance.

The Appellants argue that close propinquity to patrons is a key element of the dancers' expressive activity, and that the Ordinance is therefore a complete ban on a form of expression: "proximate dancing." This argument has been made and rejected in this circuit. *See Colacurcio v. City of Kent*, 163 F.3d 545, 549, 555 (9th Cir. 1998) (rejecting the argument that because "table dancing" is a unique form of dancing requiring proximity, a ten-foot separation requirement is a complete ban on this form of expression). It is true that if the dancers' expressive activity is considered "erotic dance within two feet of patrons" and not merely "erotic dance," this activity is completely banned. However, virtually no ordinance

would survive this analysis: the "expression" at issue could always be defined to include the contested restriction. *See id.* at 556 (rejecting the idea that the applicable "forum" for a table dance is the area within ten feet of the performer). Protected expression is not so narrowly defined. *See Dream Palace*, 384 F.3d at 1019-20 (recognizing that the regulations in *Renton* and its progeny did not "proscribe absolutely certain types of adult entertainment" and instead enacted regulations that "avoid[ed] a total ban on protected expression").

**[9]** "While the dancer's erotic message may be slightly less effective from [two] feet, the ability to engage in the protected expression is not significantly impaired." *Kev*, 793 F.2d at 1061. We hold that the Ordinance is not a complete ban on a protected form of expression.

## B

Next, we must determine what level of scrutiny properly applies. *See Ctr. for Fair Pub. Policy*, 336 F.3d at 1164. Traditionally, the Court has utilized a distinction between content-based and content-neutral regulations to determine the appropriate level of scrutiny. *See e.g., Renton*, 475 U.S. at 46-47. Time, place, and manner restrictions on adult businesses were considered content-neutral. *Id.* at 48.

Recently, however, the Supreme Court has recognized that virtually all regulation of adult businesses is content-based. *See Alameda Books*, 535 U.S. at 448 (Kennedy, J., concurring); *see also Ctr. for Fair Pub. Policy*, 336 F.3d at 1161 (recognizing Justice Kennedy's opinion in *Alameda Books* as controlling because it is the narrowest opinion joining the plurality's judgment). Content-based regulations are normally subject to strict scrutiny. *See Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991) (describing the "necessary to serve a compelling state interest" strict scrutiny test).

However, designating regulation of adult establishments as content-based does not end the inquiry as to the appropriate standard of review. Content-based regulations may be analyzed under intermediate scrutiny if two conditions are met: 1) the ordinance regulates speech that is sexual or pornographic in nature; and 2) the primary motivation behind the regulation is to prevent secondary effects. *Ctr. for Fair Pub. Policy*, 336 F.3d at 1164-65 (citing *Alameda Books*, 535 U.S. at 434, 448).

1

The Appellants differ from plaintiffs in previous cases regarding the regulation of adult businesses in that they wear minimal clothing for their offstage performances (although they perform nude on stage). The Appellants argue that the dancers' expressive activity is not sexual or pornographic because the dancers are "fully clothed." However, the appellant dancers testified that their outfits for offstage dancing include bikinis and g-strings, sometimes paired with a sheer skirt or top; at the very least, these accouterments stretch the term "fully-clothed." The dancers do cover their breasts and genitalia, but their argument that this removes their performances from the sphere of "sexual speech" ignores the context in which their offstage performances occur — in an adult cabaret, minutes after the dancers have performed nude on stage. *See Kev*, 793 F.2d at 1061 n.12 (noting that "consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved") (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 650-51 (1981)).

There is certainly a point along the continuum where suggestive speech no longer falls within the "sexual or pornographic" exception to the requirement of strict scrutiny. We are mindful that this case pushes us closer to that point than

those cases where performers are nude or topless. "Sexual speech" has never been explicitly defined, but the appellant dancers' performances, which "focus[ ] on or emphasize[ ] . . . breasts, genitals, and or buttocks," occur in adult establishments, are conducted by dancers who also perform nude, and involve minimal clothing, are certainly within the limits of "sexual speech." We therefore review the Ordinance as a regulation of "sexual or pornographic speech" and proceed to consider whether reducing the secondary effects of adult establishments is the Ordinance's primary purpose.

2

**[10]** We generally accept that a regulation's purpose is to combat secondary effects if the enactment can be justified without reference to speech. *See Colacurcio*, 163 F.3d at 551-52 (citing *Kev*, 793 F.2d at 1058-59). We have recognized that "so long as the regulation is designed to combat the secondary effects of [adult] establishments on the surrounding community, namely [ ] crime rates, property values, and the quality of the city's neighborhoods . . . then it is subject to intermediate scrutiny." *Ctr. for Fair Pub. Policy*, 336 F.3d at 1164-65 (internal citation and quotation omitted); *see also Colacurcio*, 163 F.3d at 551 (9th Cir. 1998) (noting that an ordinance is subject to intermediate scrutiny if its "predominant purpose" is combating secondary effects). For plaintiffs, this is "a difficult standard to overcome." *Colacurcio*, 163 F.3d at 552.

To determine the purpose of the Ordinance, we look to "objective indicators of intent." *Id.* at 552; *see also Ctr. for Fair Pub. Policy*, 336 F.3d at 1165. In this case we have the materials that the City Council considered in determining whether to enact the Ordinance and the Ordinance itself. These indicators demonstrate that secondary effects were the City Council's concern.

**[11]** The record indicates that the City Council was presented with several volumes of materials prior to enacting the

Ordinance. These included studies of secondary effects, declarations from police officers, reports on sexually transmitted diseases, and various other evidence. In a report to the City Council, the City Attorney recommended action to address the secondary effects reported in these resources: "[i]n reviewing the City's existing regulations and in light of the extensive existing case law and supporting studies, we conclude that this Ordinance is necessary to reduce and/or preclude these secondary effects." Our review of the materials that the City Council considered indicates that concern about secondary effects, as opposed to the content of the dancers' expression, motivated the challenged Ordinance.

[12] The Ordinance itself also demonstrates that the City Council's purpose was to combat secondary effects. The Ordinance states that it is:

> necessary for the protection of the welfare of the people, as a result of the potential negative secondary effects of adult businesses, including crime, the protection of the city's retail trade, the prevention of blight in neighborhoods and the maintenance of property values, protecting and preserving the quality of the city's neighborhoods and the city's commercial districts, the protection of the city's quality of life, the increased threat of the spread of sexually transmitted diseases, and the protection of the peace, welfare and privacy of persons who patronize adult businesses.

Ordinance, §1(A). This statement of purpose is supported by regulatory provisions that are logically linked to the secondary effects, such as solicitation of prostitution and drug transactions, that the City identified: the Ordinance forbids contact between patrons and performers and, to make this rule enforceable, requires a two-foot separation between patrons and performers. Both the two-foot rule and the no-touching

rule are reasonably linked to the secondary effects that the City identifies as its purpose in enacting the Ordinance.

We are not persuaded by the Appellants' argument that a speech-reducing motive is demonstrated by the fact that proximity between patrons and dancers is allowed when the dancers are not performing. The City may reasonably have decided that such regulations were impractical or unnecessary. The Appellants presented no evidence to support their speculation that the City chose only to regulate dancers when they are performing because it wished to regulate the performances' expressive content.

We are also unpersuaded by the Appellants' argument that a speech-reducing motive is demonstrated by a City employee's testimony that he overheard someone in staff meetings say that they wanted to drive appellant Gammoh out of business. The Appellants presented no evidence that the person who made these comments was on the City Council or affected the Council's decision to pass the Ordinance. Nothing connects this testimony to the process by which the Ordinance was passed. The testimony therefore does not create a genuine issue of material fact as to whether the City's stated goal of preventing secondary effects of adult businesses was its true purpose in enacting the Ordinance.

**[13]** The Appellants have not raised a genuine issue as to the City's motivation in enacting the Ordinance. As Justice Kennedy wrote in *Alameda Books,* "[t]he ordinance may be a covert attack on speech, but we should not presume it to be so." 535 U.S. at 447. The objective indicators of the City's intent demonstrate a desire to combat secondary effects, and the Appellants have adduced no evidence that draws this motivation into question. The Ordinance must therefore be evaluated using intermediate scrutiny.

C

**[14]** A statute will survive intermediate scrutiny if it: 1) is designed to serve a substantial government interest; 2) is nar-

rowly tailored to serve that interest; and 3) does not unreasonably limit alternative avenues of communication. *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166; *see also Renton*, 475 U.S. at 50.

1

**[15]** Reducing the negative secondary effects of adult businesses is a substantial governmental interest. *See Ctr. for Fair Pub. Policy*, 336 F.3d at 1166 ("It is beyond peradventure at this point in the development of the doctrine that a state's interest in curbing the secondary effects associated with adult entertainment establishments is substantial."). The Appellants concede that preventing secondary effects is a substantial government interest, but argue that the City's evidence of secondary effects is flawed and inapplicable. We disagree.

**[16]** The pre-enactment record in this case is substantial. *Cf. id.* at 1167-68 (describing the record as "a slim one" and "hardly overwhelming" but concluding that the studies and public hearings relied on by the legislature were sufficient to demonstrate a connection between the regulated activity and secondary effects). The City Council was presented with, *inter alia*, seventeen studies on secondary effects of adult businesses, a summary of some of these studies, the 1986 Attorney General's Report on Pornography, declarations from investigating vice officers, an interview with nude dancers, a presentation on the harmful effects of pornography in nearby Los Angeles, numerous reports on AIDS and other sexually transmitted diseases, and thirty-nine judicial decisions in the area of regulation of adult businesses. These studies and reports meet the City's burden to produce evidence demonstrating a connection between its regulations and the secondary effects that the Ordinance is intended to address. *See Alameda Books*, 535 U.S. at 441; *Ctr. for Fair Pub. Policy*, 336 F.3d at 1166.

Because the City has met this burden, "[i]f plaintiffs fail to cast direct doubt on this rationale, either by demonstrating

that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the standard set forth in *Renton*." *Alameda Books*, 535 U.S. at 438-39, *cited in Ctr. for Fair Pub. Policy*, 336 F.3d at 1160. The Appellants attempt to cast doubt by arguing that the studies on which the City relies are flawed and irrelevant.

The Appellants' proffered expert declared that the City's evidence was flawed because "systematically collecting police call-for-service information" and adhering to the Appellants' suggested methodological standards were "the only reliable information" that could have supported the City's concern. This is simply not the law. "[S]o long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses[,]" it is sufficient to support the Ordinance. *Renton*, 475 U.S. at 51-52.[5] While we do not permit legislative bodies to rely on shoddy data, we also will not specify the methodological standards to which their evidence must conform. *See id.* at 51; *see also Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring) ("As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners."). The Appellants have failed to create a genuine issue of material fact as to the reliability of the collection of evidence upon which the City relied.

---

[5]The Seventh Circuit has succinctly explained why clear proof of secondary effects is not required:

> A requirement of *Daubert*-quality evidence would impose an unreasonable burden on the legislative process, and further would be logical only if *Alameda Books* required a regulating body to prove that its regulation would — undeniably — reduce adverse secondary effects. *Alameda Books* clearly did not impose such a requirement.

*G.M. Enters., Inc. v. Town of St. Joseph, Wis.*, 350 F.3d 631, 640 (7th Cir. 2003).

The Appellants also argue that even if the City's evidence is reliable, it is irrelevant because it does not measure the secondary effects of *clothed* performances. No precedent requires the City to obtain research targeting the exact activity that it wishes to regulate: the City is only required to rely on evidence "reasonably believed to be relevant" to the problem being addressed. *Alameda Books*, 535 U.S. at 438. The studies upon which the City relied evaluate the secondary effects of a variety of adult businesses — a category encompassing any business that would be affected by the Ordinance — and are therefore unquestionably relevant.

The presence or absence of minimal clothing is not relevant to whether separation requirements fulfill the stated purpose of the Ordinance. This circuit recognizes that municipalities may reasonably find that separation requirements serve the interest of reducing the secondary effects of adult establishments. "Buffers" between patrons and performers prevent the exchange of money for prostitution or drug transactions and allow enforcement of "no touching" provisions, which would otherwise be virtually unenforceable. *See Colacurcio*, 163 F.3d at 554. There is no reason to believe that minimal clothing obviates the need for these measures when the atmosphere is equally charged — money exchanges and touching are no more difficult if the dancer is wearing minimal clothing than if she is partially or fully nude.[6]

[17] The Appellants have not presented evidence sufficient to create a genuine issue of material fact as to whether the two-foot rule is designed to serve a substantial governmental interest in preventing the secondary effects of adult establishments. The Ordinance therefore survives the first prong of the *Renton* test.

---

[6]The City Council was presented with a report documenting an interview with former adult dancers from another jurisdiction in which the dancers indicated that solicitations for sexual favors occurred "whether the club is nude or not" and that drugs were frequently passed during tipping.

2

**[18]** Our next consideration is whether the City's two-foot rule is narrowly tailored to address the problem of secondary effects from adult entertainment. *See Ctr. for Fair Pub. Policy*, 336 F.3d at 1166. The Ordinance's two-foot separation requirement is more narrow than other separation requirements that the Ninth Circuit has upheld. *See Colacurcio*, 163 F.3d at 553-54 (upholding a ten-foot separation requirement); *BSA, Inc. v. King County*, 804 F.2d 1104, 1110-11 (9th Cir. 1986) (upholding a six-foot separation requirement); *Kev*, 793 F.2d at 1061-62 (upholding a ten-foot separation requirement). These earlier cases involved nude or topless dancing, and therefore differ from the case before us. Nonetheless, they guide us in now holding that in the context of a club that features on-stage nude dancing and offstage minimally clothed dancing, the City's two-foot separation requirement is narrowly tailored to prevent the exchange of money or drugs and to allow enforcement of the "no touching" provisions.

3

**[19]** Finally, we consider whether the Ordinance leaves open ample alternative avenues of communication. *See Ctr. for Fair Pub. Policy*, 336 F.3d at 1166. This inquiry is analogous to that in Section IV(A), *supra*, which concluded that the Ordinance is not a complete ban on protected expression. The challenged Ordinance leaves dancers free to convey their erotic message as long as they are two feet away from patrons. Although the message may be slightly impaired from this distance, it cannot be said that a dancer's performance "no longer conveys eroticism" from two feet away. *Dream Palace*, 384 F.3d at 1021 (internal citation and quotation omitted). Because the dancer's erotic message may still be communicated from a slight distance, the Ordinance survives this final prong of the *Renton* analysis.

**[20]** As detailed above, the Ordinance's two-foot rule is narrowly tailored to address the City's concerns about the sec-

ondary effects of adult establishments and leaves alternate channels of communication open by allowing dancers to perform at a two-foot distance. The Ordinance survives intermediate scrutiny.

V

The Ordinance was thoroughly researched and narrowly tailored to combat the negative side-effects of adult businesses that the City's research identified. Regulating adult businesses will always place the City's concerns in tension with First Amendment protections. In this case, however, the City of La Habra designed an Ordinance that falls within what has previously been accepted as constitutional in this circuit, despite the minimal amount of clothing that the appellant dancers wear when performing. The Ordinance is not vague or overbroad, and the Appellants have raised no genuine issue of material fact regarding their takings or First Amendment claims. The judgment of the district court is therefore **AFFIRMED.**